IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| M.T., a minor by and through his grandmother and next friend, EDWINA WOODLEY, et al., | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | C.A. NO.: 2:21-cv-00364 |
| TATUM UNIFIED SCHOOL DISTRICT, | § § | |
| Defendant. | § § | |

### TATUM INDEPENDENT SCHOOL DISTRICT'S
### MOTION FOR SUMMARY JUDGMENT[1]

Tatum Independent School District (Tatum ISD or the District) moves for summary

judgment as follows:

---

[1] Tatum Independent School District has timely moved to dismiss all of Plaintiffs' claims against it. *See* Dkts. 57, 74. The Court has yet to rule. Therefore, the District moves for summary judgment without waiving its motion to dismiss.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ............................................................................................v

STATEMENT OF THE ISSUES.....................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2

    Ms. Cox fraudulently enrolls K.C. in Kindergarten at Tatum Primary School ..................2

    Ms. Woodley fraudulently enrolls M.T. in the Head Start program at Tatum Primary School.......................................................................................................................3

    K.C. and M.T. are purposefully sent to school out of dress code .......................................4

    K.C. and M.T. are administratively withdrawn from the District after it is discovered that neither was entitled to receive instruction in the District and neither was properly enrolled.................................................................................................9

    K.C. and M.T. file grievances and both are denied by the Board......................................10

    The District amends its dress code......................................................................................10

ARGUMENT & AUTHORITIES ..................................................................................12

    A.  Standard of Review...................................................................................................12

    B.  Students do not hold a constitutional or statutory right to wear their hair at the length or style desired ...............................................................................................12

    C.  Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Section 1983 claim of race discrimination ...........................................................................................................14

        1.  There is no evidence to show the Board had actual or constructive knowledge of the alleged constitutional violations against Plaintiffs...................15

2. Even if the evidence showed the Board had actual knowledge (and it does not), Plaintiffs cannot prove a persistent, widespread pattern or practice of highly similar unconstitutional behavior by District officials or employees .........17

3. Even if Plaintiffs could establish a persistent and widespread pattern of unconstitutional behavior known by the Board (and they cannot), the evidence conclusively establishes that the District did not act with deliberate indifference to their constitutional rights .............................................19

D. Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Section 1983 claim of sex discrimination, because although the District's former hair length restriction treated male and female students differently, on its face, it did not amount to invidious discrimination against male students ...........................................................20

E. Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Title VI claim .....................................22

1. Even if the law did support a Title VI claim based on hair length (and it does not), there is no evidence that the District or its employees discriminated, let alone intentionally discriminated, against Plaintiffs, or any other student, based on their race ...................................................................22

2. What is more, Plaintiffs' Title VI claims should be dismissed because mental anguish damages are not recoverable under Title VI .................................23

F. Even if it were actionable, the undisputed evidence as applied to the current state of law does not raise a genuine question of material fact to support Plaintiffs' Title IX claim ...........................................................................................23

1. The purpose behind Title IX and the current state of law in the analogous employment context does not support Plaintiffs' claims that restrictions on hair styles or hair lengths are discriminatory based on gender ............................24

2. What is more, Plaintiffs' Title IX claim should be dismissed because mental anguish damages are not recoverable under Title IX .............................................27

G. Even if it were actionable, the undisputed evidence as applied to the current state of law does not raise a genuine question of material fact to support Plaintiffs' First Amendment claim ...........................................................................27

1. Under binding precedent, hair length and style does not objectively communicate any message that enjoys First Amendment protection ...................27

2. Even if hair length and style objectively communicated any message that enjoys First Amendment protection, the undisputed evidence does not support that M.T. communicated his intent to wear his hair at a certain length as a discrete message to the world ...............................................28

3. Even if hair length and style objectively communicated any message that enjoys First Amendment protection, the undisputed evidence does not support that K.C. communicated his intent to wear his hair in a ponytail as a discrete message to the world ...........................................................................28

4. Regardless, there is no evidence to establish municipal liability against the District for alleged violations of Plaintiffs' First Amendment constitutional rights ...........................................................................................................29

H. To the extent M.T. is now attempting to bring a claim for religious discrimination, it is not adequately pled and the evidence conclusively establishes a reasonable accommodation was given.....................................................29

I. As the District has already amended its dress code to remove the relevant language, K.C. no longer attends school within the District, and Plaintiffs' claims do not establish an actual controversy, their request for declaratory relief should be denied ....................................................................................................30

CONCLUSION AND PRAYER .................................................................................30

CERTIFICATE OF SERVICE ..................................................................................31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alton v. Tex. A&M Univ.*,
    168 F.3d 196 (5th Cir. 1999) ............................................................ 19

*Ansonia Bd. of Educ. v. Philbrook*,
    479 U.S. 60 (1986) ............................................................................ 30

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
    520 U.S. 397 (1997) .................................................................... 15, 19

*Blau v. Fort Thomas Pub. Sch. Dist.*,
    401 F.3d 381 (6th Cir. 2005) .................................................... 21, 22

*Burge v. St. Tammany Parish*,
    336 F.3d 363 (5th Cir. 2003) ............................................................ 17

*Canady v. Bossier Parish Sch. Dist.*,
    240 F.3d 437 (5th Cir. 2001) .................................................... 21, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................... 12

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................... 25

*Connick v. Thompson*,
    563 U.S. 51 (2011) ............................................................................ 17

*Cummings v. Premier Rehab Keller*,
    142 S. Ct. 1562 (2022) ............................................................... 23, 27

*Davenport v. Randolph Cty. Bd. of Educ.*,
    730 F.2d 1395 (5th Cir. 1984) .......................................................... 21

*DIRECTV, Inc. v. Budden*,
    420 F.3d 521 (5th Cir. 2005) ............................................................ 12

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ...................................................................... 14

*Doe v. Dallas Indep. Sch. Dist.*,
    153 F.3d 211 (5th Cir. 1998) ............................................................ 19

*Doe v. Taylor Indep. Sch. Dist.*,
    15 F.3d 443 (5th Cir. 1994) .............................................................. 19

*Domico v. Rapides Par. Sch. Bd.*,
  675 F.2d 100 (5th Cir. 1982) ........................................................................ 13

*EEOC v. Catastrophe Mana. Sols.*,
  852 F.3d 1018 (11th Cir. 2016) .................................................................... 26

*Eppersen v. Pasadena Indep. Sch. Dist.*,
  386 F. Supp. 317 (S.D. Tex. 1974) ............................................................... 14

*Estate of Davis v. City of North Richland Hills*,
  406 F.3d 375 (5th Cir. 2005) .................................................................. 17, 19

*Eugene v. Alief Indep. Sch. Dist.*,
  65 F.3d 1299 (5th Cir. 1995) ........................................................................ 15

*Fenceroy v. Morehouse Par. Sch. Bd.*,
  2006 WL 39255 (W.D. La. Jan. 6, 2006) ...................................................... 20

*Fennell v. Marion Indep. Sch. Dist.*,
  804 F.3d 398 (5th Cir. 2015) .................................................................. 22, 23

*Ferrell v. Dall. Indep. Sch. Dist.*,
  392 F.2d 697 (5th Cir. 1968) .......................................................... 12, 27, 28

*Fisher v. Moore*,
  73 F.4th 367 (5th Cir. 2023) ........................................................................ 14

*Forsyth v. Barr*,
  19 F.3d 1527 (5th Cir. 1994) ........................................................................ 12

*Freeman v. Flake*,
  448 F.2d 258 (10th Cir. 1971) ................................................................ 13, 21

*Frye v. Anadarko Petro. Corp.*,
  953 F.3d 285 (5th Cir. 2019) ........................................................................ 30

*Gfell v. Rickelman*,
  441 F.2d 444 (6th Cir. 1971) ................................................................ 13, 21

*Hagan v. Houston Indep. Sch. Dist.*,
  51 F.3d 48 (5th Cir. 1995) ............................................................................ 19

*Hanson v. Highland Home Holdings, Inc.*,
  1997 WL 86456 (N.D. Tex. Feb. 26, 1997) .................................................. 26

*Harper v. Blockbuster Entertainment Corp.*,
139 F.3d 1385 (11th Cir. 1998) ................................................. 26

*Jacobs v. Clark Cnty. Sch. Dist.*,
526 F.3d 419 (9th Cir. 2008) ..................................................... 21

*Jespersen v. Harrah's Operating Co.*,
444 F.3d 1104 (9th Cir. 2006) ............................................... 22, 26

*Jett v. Dallas Indep. Sch. Dist.*,
798 F.2d 748 (5th Cir. 1986) ..................................................... 15

*Jones v. City of Detroit*,
20 F.4th 1117 (6th Cir. 2021) ................................................... 23

*Karr v. Schmidt*,
460 F.2d 609 (5th Cir. 1972) .............................................. Passim

*Mercado v. Lynch*,
823 F.3d 276 (5th Cir. 2016) ..................................................... 21

*N. Haven Bd. of Educ. v. Bell*,
456 U.S. 512 (1982) ................................................................. 23

*Peterson v. City of Fort Worth, Tex.*,
588 F.3d 838 (5th Cir. 2009) ..................................................... 17

*Rodgers v. Smith*,
842 F. App'x 929 (5th Cir. 2021) ............................................... 23

*Rollerson v. Brazos River Harbor Navigation Dist.*,
6 F.4th 633 (5th Cir. 2021) ....................................................... 22

*Stevenson v. Board of Education of Wheeler County, Georgia*,
426 F.2d 1154 (5th Cir. 1970) ............................................... 20, 21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ............................................................ 12, 27

*Trent v. Perritt*,
391 F. Supp. 171 (S.D. Miss. 1975) ........................................... 24

*U.S. v. Alcantar*,
733 F.3d 143 (5th Cir. 2013) ..................................................... 13

*Valle v. City of Houston,*
    613 F.3d 536 (5th Cir. 2010) ........................................................ 17

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ................................................................... 27

*Wang v. Bethlehem Cent. Sch. Dist.,*
    2022 WL 3154142 (N.D.N.Y. Aug. 8, 2022) ................................ 25

*Willingham v. Macon Telegraph Publishing Company.,*
    507 F.2d 1084 (5th Cir. 1975) ............................................... 25, 26

*Zeller v. Donegal School Dist.,*
    517 F.2d 600 (3d Cir. 1975) .................................................. 13, 21

## FEDERAL STATUTES, REGULATIONS AND RULES

20 U.S.C. § 1681(a) ..................................................................... 23

42 U.S.C. § 2000d ........................................................................ 22

39 Fed. Reg. 22228 (June 20, 1974) ............................................ 24

47 Fed. Reg. 32526-02 (July 28, 1982) ........................................ 24

65 Fed. Reg. 52858-01 (Aug. 30, 2000) ...................................... 25

82 Fed Reg. 46655 (Oct. 6, 2017) ............................................... 25

Fed. R. Civ. P. 56(a) .................................................................... 12

## OTHER AUTHORITIES

Equal Emp't Opp. Comm., CM-619 Grooming Standards (1989) .................................... 27

Tex. Att'y Gen. Op. No. KP-0396 (2021) ..................................... 23

Carolyn Ellis Staton, *Sex Discrimination in Public Education,*
    58 Miss. L.J. 323 (1998) ............................................................ 25

# STATEMENT OF THE ISSUES

1.  Plaintiffs cannot establish a viable Section 1983 claim for race discrimination because the evidence conclusively establishes that the Board of Trustees (the Board) did not have actual or constructive knowledge of a persistent or widespread practice by District officials or employees that constituted a custom or practice that fairly represented District policy.

2.  Plaintiffs cannot establish a viable Section 1983 claim for race discrimination because the evidence conclusively establishes that the District did not use race as an invidious criterion for determining which students are disciplined for violating the District's dress and grooming code, in violation of Plaintiffs' constitutional rights.

3.  Plaintiffs' Section 1983 Equal Protection Clause sex discrimination claims should be dismissed because Fifth Circuit authority holds that a student does not have a constitutionally protected right to wear their hair at the length and in the style of their choice.

4.  Plaintiffs cannot establish a viable Section 1983 claim for sex discrimination because the evidence conclusively establishes that the District had a legitimate governmental interest for its former dress and grooming code prohibiting male students from wearing hair longer than their shoulders or in a ponytail.

5.  Plaintiffs' Title IX claims should be dismissed because Title IX does not apply to dress and grooming codes and Fifth Circuit authority holds that a student does not have a protected right to wear their hair at the length and in the style of their choice.

6.  Plaintiffs' Section 1983 First Amendment claims should be dismissed because Fifth Circuit authority holds that hair length does not objectively communicate any message that enjoys First Amendment protection.

7.  Plaintiffs' Section 1983 First Amendment claims should be dismissed because the evidence conclusively establishes that neither M.T. nor K.C. were trying to communicate a message by the style or length of their hair.

8.  To the extent M.T. is now attempting to bring a claim for religious discrimination, it is not adequately pled and the evidence otherwise conclusively establishes a reasonable accommodation was given.

9.  Plaintiffs' claims for mental anguish damages brought under Title VI and Title IX must be dismissed because damages for emotional harm are not recoverable under these statutes as a matter of law.

10. Plaintiffs' claims for injunctive and declaratory relief should be dismissed as moot because the District has already amended its dress code to remove the relevant language, K.C. no longer attends school within the District, and there is no evidence to support Plaintiffs' Section 1983, Title IX, or Title VI claims.

Tatum ISD is a public school district located in Tatum, Texas. https://www.tatumisd.org/about. As a public school district, it is governed by its Board of Trustees (the Board), which is an elected body consisting of engaged members of the local community. Affidavit of Dr. J.P. Richardson, attached as Exh. 1, at ¶ 6. Since at least 2004, the District's Board has set dress and grooming standards for its students. *Id*. at ¶¶ 6-7.

For the beginning of the 2019-2020 school year, the District's dress code required that all male students' hair, regardless of race, did not extend below the collar of a t-shirt or button-down shirt, or the student's shoulders. *Id*. at ¶ 9; Tatum ISD Student Dress Code for 2019-2020 School Year, attached as Exh. 2. Male students, regardless of race, were also not allowed to wear their hair in ponytails, ducktails, rat-tails, male buns, or puffballs. *Id*. The purpose for listing these specific hairstyles was to ensure male students' hair complied with the length requirement, regardless of whether the student put their hair up. Exh. 1 at ¶ 9. At the time, the District believed these restrictions for male students' hair taught students grooming standards and rules they very well may encounter in a professional setting after graduating from high school. *Id*. at ¶ 10; Deposition Excerpts of J.P. Richardson, attached as Exh. 13, at 58:3-7, 60:22-25. This helped ensure students' success in all chosen paths of life, including all branches of the U.S. military that have historically, and currently, restrict hair length for male enlisted personnel and officers. Exh 1 at ¶ 10; Exh. 13, at 58:3-7, 60:22-25.

***Ms. Cox fraudulently enrolls K.C. in Kindergarten at Tatum Primary School.***

In August of 2019, Kambry Cox, K.C.'s mother, enrolled K.C. in Kindergarten at Tatum Primary School (TPS) for the 2019-2020 school year. *See* Deposition Excerpts of Kambry Cox, attached as Exh. 3, at 16:6-10. K.C. was 5 years old at the time. *Id*. at 10:2-3. At the time of

enrollment, Ms. Cox was required to submit proof of residency to enroll K.C. Exh. 1 at ¶ 17. However, during the entirety of K.C.'s lifetime, Ms. Cox and K.C. have never lived within Tatum ISD. Exh. 3 at 11:12-24. Rather, Ms. Cox has always resided within Carthage Independent School District. *Id*.; Deposition Excerpts of K.C., attached as Exh. 16, at 37:16-38:2. As such, in order to enroll K.C. at Tatum ISD, Ms. Cox intentionally submitted a property tax bill for an undeveloped piece of land that is within the District, but that she and K.C. have never lived on. Exh. 3 at 33:17-34:19; Exh. 1 at ¶ 18; Property Tax Statement Submitted by Kambry Cox, attached as Exh. 4. It is, therefore, undisputed that K.C. was never properly enrolled in the District.

***Ms. Woodley fraudulently enrolls M.T. in the Head Start program at Tatum Primary School.***

In previous years, including the 2019-2020 school year, the District contracted with Region VII Education Service Center to implement and operate the Head Start program at the District. Exh. 1 at ¶ 11. Head Start was a federally funded program for low-income children and their families that offered additional services for eligible families in the District to assist those children to become school ready, prior to compulsory attendance taking effect (i.e., Kindergarten). *Id*. Head Start was voluntary for income-eligible families within the District. Deposition Excerpts of Edwina Woodley, attached as Exh. 5, at 52:8-53:8. Although the Head Start program was located within TPS and District employees taught the students enrolled in Head Start, Head Start had its own staff, eligibility requirements, and enrollment process separate and apart from the District that was overseen by Region VII. Exh. 1 at ¶ 11. Regardless, students who participated in Head Start were also students of the District and required to abide by all District policies, including the District's dress and grooming code. *Id*.

On August 1, 2019, Edwina Woodley, M.T.'s legal guardian, met with Ms. Denise McCoy, an employee with Region VII's Head Start program, to enroll M.T. in Head Start. Statement by

Denise McCoy, attached as Exh. 6; Exh. 5 at 35:6-38:8. Initially, Ms. Woodley was told her income did not qualify to enroll M.T. in Head Start. Exh. 6. Ms. Woodley then met with her mother, Barbara Johnson, whose income did qualify. *Id*. Ms. Woodley superficially transferred guardianship of M.T. to Ms. Johnson for purposes of enrolling M.T. in Head Start. Head Start Enrollment Paperwork and Sworn Declaration Transferring Guardianship, attached as Exh. 7. However, it is undisputed that, at all times, M.T. has resided with Ms. Woodley, and not Ms. Johnson. Exh. 5 at 34:14-35:5. Of note, based on these actions, Ms. Woodley was later charged by the Rusk County District Attorney's Office for Tampering With a Government Record. Motion to Dismiss Cause No. 20020082CR, attached as Exh. 8. The charges were ultimately dismissed after Ms. Woodley completed an informal Pre-Trial Diversion. *Id*.

### K.C. and M.T. are purposefully sent to school out of dress code.

During the Fall semester of 2019, both Ms. Woodley and Ms. Cox were aware the District had a dress code requiring male students' hair to be above the shoulders and prohibiting specific hair styles on male students, including ponytails. Exh. 2; Exh. 6; Exh. 5 at 55:4-12; Exh. 3 at 42:8-43:3. Both received copies of the student code of conduct and student handbook, which includes the dress and grooming code, and executed acknowledgement forms stating their children would be subject to disciplinary consequences for misbehavior. Executed Handbook and Student Code of Conduct Acknowledgement Forms 2019-20, attached as Exh. 9.

Prior to the start of school, on August 9, 2019, Ms. Woodley met with and discussed the length of M.T.'s hair with Mrs. Tamara Fite, the Principal of TPS. Exh. 5 at 67:15-70:3; Deposition Excerpts of Tamara Fite, attached as Exh. 37, at 46:1-49:4; Affidavit of TPS Principal Tamara Fite, attached as Exh. 10, at ¶ 22; Statement by Kelly Sorenson, attached as Exh. 11. During this meeting, Mrs. Fite and Ms. Woodley discussed the different ways Ms. Woodley could style M.T.'s

hair to ensure he was in compliance with the District's dress code. Exh. 5 at 67:15-69:11; Exh 10. at ¶ 22. This included braiding M.T.'s hair. Exh. 5 at 67:15-69:11; Exh 10 at ¶ 22. It is undisputed that, even prior to M.T.'s enrollment in Head Start, Ms. Woodley would commonly braid M.T.'s hair. Exh. 5 at 76:10-77:22, 85:15-86:21. Ms. Woodley also met with Superintendent J.P. Richardson prior to the start of school. *Id*. at 86:22-90:21, 113:14-22. During this meeting Dr. Richardson provided the same options Mrs. Fite offered to ensure M.T. would be in compliance with the dress code.[2] *Id*. at 90:2-18. After these meetings, Ms. Woodley still chose to voluntarily (although improperly) enroll M.T. in Head Start. *Id*. at 113:14-22.

During the Fall of 2019, K.C. wore his hair in locs. Exh. 3 at 21:6-22:17; Exh. 10 at ¶ 12. It is undisputed that the District did not prohibit K.C. from wearing his hair in locs. Exh. 3 at 21:6-22:17; Exh. 10 at ¶ 12. What is more, K.C.'s locs, in their natural state, did not violate the dress code, as the length did not extend past his shoulders. Exh. 3 at 28:9-19, 48:19-49:3, 61:8-62:17; Exh. 10 at ¶ 12; Exh. 37 at 40:8-12, 102:4-18.

The first day of school for the 2019-2020 school year was Wednesday, August 14, 2019. Exh. 10 at ¶ 11. After the first week of school ended, on Friday, August 16, 2019, Principal Fite sent a letter home with each student at TPS reminding parents about the District's dress code. *Id*. This was common practice to remind students and parents of the dress code as students returned from Summer vacation and were transitioning back to the school's dress code. *Id*.

---

[2] There is a dispute surrounding an alleged statement by Dr. Richardson during this initial meeting. Ms. Woodley contends in her deposition that, after she asked Dr. Richardson why a male high school student was allowed to wear wigs to school, Dr. Richardson gave Ms. Woodley the option to put M.T. in a dress and have him identify as transgender. Exh. 5 at 88:11-16, 93:1-94:11; *but see* Woodley Facebook Post 1, attached as Exh. 12. Dr. Richardson denies ever making that statement. Dr. Richardson contends that, after Ms. Woodley inquired about a male high school student who was allowed to wear long hair and dresses, he explained that that situation was different as that student was transitioning from male to female. Exh. 13 at 70:21-71:18; Exh. 1 at ¶ 14. Regardless, this dispute is immaterial to the claims at issue. As such, the dispute does not create a genuine question of material fact that precludes summary judgment.

Both M.T. and K.C. were in dress code the first week of school without issue. Exh. 5 at 147:5-150:16; Exh. 3 at 28:11-15; Exh. 10 at ¶ 26. However, on Monday, August 19, 2019, M.T. and K.C. both arrived at school out of dress code: M.T.'s hair extended below his shirt collar and K.C.'s hair was in a ponytail or pigtails. Exh. 10 at ¶¶ 13, 27; Exh. 5 at 113:23-115:5; Exh. 3 at 28:9-15. Principal Fite sent both M.T. and K.C. home with a letter stating they were out of compliance with the District's dress code and requested parental assistance to ensure the students were in compliance in the future. Exh. 10 at ¶¶ 6, 13, 27; Exh. 3 at 42:8-43:3, 48:9-49:7; August 19, 2019, Dress Code Letter, attached as Exh. 14; Exh. 37 at 66:2-20. These letters are commonly used by TPS in an effort to avoid disciplinary measures due to dress code violations. Exh. 10 at ¶ 6. The following day, on August 20, 2019, Ms. Woodley had another meeting with Principal Fite to discuss how M.T. could comply with the hair restrictions for male students. Exh. 10 at ¶ 29. Ms. Cox did not speak with Principal Fite about the dress code letter. Exh. 10 at ¶ 13.

On August, 23, 2019, Ms. Woodley delivered a typed letter to Principal Fite outlining the reasons why she disagreed with the hair length restrictions for male students and requesting the letter be placed in M.T.'s student file. Woodley Letter, attached as Exh. 15; Exh. 10 at ¶ 30. Specifically, Ms. Woodley stated it was within her civil rights, in general, to style M.T.'s hair as she chooses. Exh. 15. Of note, this letter does not state M.T. wore his hair long, or in any other style, for spiritual or cultural reasons or as an expression of his identity or culture. *Id*.

Both M.T. and K.C. were in dress code from August 20 through September 17, 2019. Exh. 10 at ¶¶ 14, 31; Exh. 3 at 58:20-59:3; Exh. 5 at 148:12-150:16. K.C. wore his hair down, and not in a ponytail. Exh. 3 at 58:20-59:3. And M.T. wore his hair braided, above his shoulders and shirt collar. Exh. 5 at 148:12-150:16.

On Wednesday, September 18, 2019, K.C. and M.T. both arrived at school out of dress code: M.T.'s hair extended below his shirt collar and K.C.'s hair was in a ponytail or pigtails. Exh. 10 at ¶¶ 14, 32; Exh. 5 at 150:14-151:23; Exh. 3 at 59:4-62:17. Principal Fite called Ms. Cox and offered her the ability to come to school and fix K.C.'s hair so that he was in compliance. Exh. 10 at ¶ 14; Exh. 3 at 68:7-12. Ms. Cox came to the school and removed the hair accessory holding K.C.'s hair up in a ponytail or pigtails. Exh. 10 at ¶ 14; Exh. 3 at 68:7-12. As K.C. was then in compliance with the dress code, K.C. was able to go back to class without further issue. Exh. 10 at ¶ 14. Principal Fite also called Ms. Woodley and offered her the ability to come to school and fix M.T.'s hair so that he was in compliance. Exh. 10 at ¶ 32; Exh. 5 at 150:14-151:23. Ms. Woodley came to the school and braided and pinned M.T.'s hair up. Exh. 10 at ¶ 32; Exh. 5 at 150:14-151:23. As M.T. was then in compliance with the dress code, M.T. was able to go back to class without further issue. Exh. 10 at ¶¶ 14, 32.

On Thursday, September 19, 2019, K.C. and M.T. both arrived at school out of dress code: M.T.'s hair was in a ponytail and K.C.'s hair was in a ponytail or pigtails. Exh. 10 at ¶¶ 15, 33; Exh. 3 at 62:18-63:18; Exh. 5 at 156:3-160:7. Principal Fite, once again, called both Ms. Cox and Ms. Woodley, individually, to allow them the opportunity to come to school and bring K.C. and M.T. into compliance with the dress code. Exh. 10 at ¶¶ 15, 33; Exh. 3 at 67:21-68:12; Exh. 5 at 156:3-160:7. Both came to the school but, at that time, refused to fix K.C.'s and M.T.'s hair to comply with the dress code. Exh. 10 at ¶¶ 15, 33. Based on Ms. Woodley's and Ms. Cox's decisions, K.C. and M.T. were sent to the Redirect Room for the remainder of the day as they were out of dress code. Exh. 10 at ¶¶ 7, 15, 33; Exh. 37 at 38:1-39:17. While in the Redirect Room, M.T. and K.C. received work from their teachers and ate lunch with each other and the other students in the Redirect Room at that time. Exh. 10 at ¶¶ 7, 15, 33; Exh. 16 at 40:8-18, 46:9-47:23,

60:11-61:15[3]; Deposition Excerpts of M.T., attached as Exh. 17, at 28:11-29:21; Exh. 37 at 37:21-23.

On Friday, September 20, 2019, M.T. arrived at school out of dress code with his hair in a ponytail. Exh. 10 at ¶ 34. K.C. was not in school on September 20, 2019. Exh. 10 at ¶ 16. Ms. Woodley decided to pick M.T. up early, during breakfast, and sign him out for the day. Exh. 10 at ¶ 34. M.T. was not sent to the Redirect Room that day. *Id*.

Around this time, Ms. Woodley posted to her Facebook page that she intended to purposefully send M.T. to school out of dress code, requiring him to be sent to the Redirect Room. Exh. 10 at ¶ 35; Woodley Facebook Post 2, attached as Exh. 18. Based on this public statement, Principal Fite made the decision to hire a substitute teacher, at the expense of the District, to privately work with M.T. each day Ms. Woodley sent him to school out of dress code, starting Monday, September 23, 2019. Exh. 10 at ¶ 35; Exh. 37 at 71:9-21, 73:16-24. Principal Fite further decided M.T. would eat breakfast and have recess with his classmates, regardless of whether he was in dress code or not. Exh. 10 at ¶ 35; Exh. 37 at 71:9-21, 73:16-24. Principal Fite did not think it was right for a 4-year-old to be forced to sit in the Redirect Room – which was meant to be a temporary placement for students misbehaving during the day – due to the decision of his guardian. Exh. 10 at ¶ 35.

M.T. came to school out of dress code, with his hair in a ponytail, from Monday, September 23 through Friday, September 27, 2019. Exh. 10 at ¶¶ 36-40; Exh. 5 at 156:3-160:7. Principal Fite called Ms. Woodley each day to offer her the opportunity to come to school and fix M.T.'s hair so that he was in compliance with the dress code. Exh. 10 at ¶¶ 36-40; Exh. 5 at 156:3-160:7. Each

---

[3] K.C. testified that he was in the Redirect Room (or ISS as he refers to it) for two days, instead of just one. *But see* Exh. 16 at 47:16-23 (Plaintiffs' counsel objecting to deposition questions posed to K.C. based on the length of time that has past); *see also* Exh. 37 at 67:24-25.

day Ms. Woodley refused. Exh. 10 at ¶¶ 36-40; Exh. 5 at 156:3-160:7. As such, M.T. would be placed in the Redirect Room to do his work with the substitute teacher and have breakfast and recess with his classmates. Exh. 10 at ¶¶ 36-40; Exh. 17 at 33:7-21.[4]

***K.C. and M.T. are administratively withdrawn from the District after it is discovered that neither was entitled to receive instruction in the District and neither was properly enrolled.***

In September of 2019, the District discovered that Ms. Cox falsely enrolled K.C. in Tatum ISD by submitting a property tax document for a piece of property that was within the District, but that she and K.C. did not live at. Exh. 1 at ¶¶ 17-18; Exh. 10 at ¶ 17; Exh. 3 at 11:12-24, 33:13-34:19; Exh. 37 at 56:19-57:7. Rather, the property was a piece of undeveloped land with an empty trailer on it. Exh. 1 at ¶¶ 17-18; Exh. 10 at ¶ 17; Exh. 3 at 11:12-24, 33:13-34:19. As K.C. was not properly enrolled as a student within Tatum ISD, on September 25, 2019, K.C. was officially unenrolled from the District. Exh. 1 at ¶¶ 17-18; Exh. 10 at ¶ 17; TEA Withdrawal Form – K.C., attached as Exh. 19.

On September 13, 2019, Head Start conducted a routine home visit at M.T.'s home. Parent/Teacher Conference Form, attached as Exh. 20. At this time, it was discovered that M.T. resided with Ms. Woodley and not Barbara Johnson, Ms. Woodley's mother and the adult who enrolled M.T. in Head Start based on her limited income. Exh. 1 at ¶ 19; Exh. 10 at ¶ 41; Exh. 37 at 27:16-28:17, 53:11-54:18. As M.T. was not properly enrolled with Head Start, M.T. was not properly enrolled with the District, regardless of his residency, because M.T. was not old enough for Kindergarten and did not qualify for Head Start based on his guardian's (i.e., Ms. Woodley) income. Exh. 1 at ¶ 19. As such, on September 30, 2019, M.T. was officially unenrolled from the District. TEA Withdrawal Form – M.T., attached as Exh. 21.

---

[4] M.T. testified that he was in the Redirect Room for three weeks. *But see* Exh. 5 at 114:18-115:5 (Ms. Woodley testifying on multiple occasions that M.T. was only 4 and therefore could not communicate how the braids hurt his head and why he liked his hair long or in a ponytail).

Neither student was "expelled." Exh. 13 at 33:10-34:6; Exh. 37 at 36:10-13.

***K.C. and M.T. file grievances and both are denied by the Board.***

On October 11, 2019, both Ms. Woodley and Ms. Cox filed almost identical grievances with the District to dispute the unenrollment of M.T. and K.C., as well as request the District change its dress code restricting the length of male students' hair. Level I Grievance Form – Woodley, attached as Exh. 22; Level I Grievance Form – Cox, attached as Exh. 23. The District decided to hear both grievances at Level III, rather than requiring the grievances to proceed through Levels I and II first. Exh. 1 at ¶ 20. Level III grievances are heard by the Board. *Id*. The Level III grievance hearing was held on October 21, 2019. *Id*.; October 21, 2019, Board Meeting Minutes, attached as Exh. 24; Transcript of Level III Grievance, attached as Exh. 25. Ms. Woodley and Ms. Cox were represented by counsel, Mr. Waukeen McCoy. Exhs. 22, 23, 25. At the end of the hearing, the Board voted to deny both Ms. Woodley's and Ms. Cox's grievances. Exh. 24; Exh. 25 at pg. 16.

***The District amends its dress code.***

On November 6, 2019, the District's Improvement Team (DIT) met. November 6, 2019, DIT Meeting Agenda, attached as Exh. 26. The DIT is a group of selected individuals consisting of community members and District employees that meet regularly throughout the school year to discuss and revise District policies and procedures, as needed. Exh. 1 at ¶ 21; Deposition Excerpts of Drenon Fite, attached as Exh. 27, at 45:9-52:7. Assistant Superintendnet Drenon Fite heads the DIT. Exh. 27 at 39:14-40:1. At this meeting, the language in the District's dress code prohibiting certain hair styles for male students was discussed. Exh. 27 at 45:9-52:7; Exh. 26. Based on the mere possibility that the use of "ponytails, ducktails, rat-tails, male buns, or puffballs" could be seen as discriminatory towards any race of student, the DIT voted to remove this language. Exh.

27 at 45:9-52:7. However, in order to ensure the District's dress code still required male students' hair to be above shoulder-length, the DIT voted to add language prohibiting male students from wearing hair accessories. Exh. 1 at ¶ 21; Exh. 26.

On November 11, 2019, Assistant Superintendent Drenon Fite presented the revisions to the dress code to the Board. November 11, 2019, Board Minutes, attached as Exh. 28. The revised dress code became effective immediately and was posted to the District's website. November 11, 2019, Revised Dress Code, attached as Exh. 29; Exh. 1 at ¶ 21.

In June of 2020, after further conversations between Assistant Superintendent Fite and Superintendent Richardson, Superintendent Richardson decided to revise the District's dress code to allow students to have visible tattoos, allow male students to wear earrings, and allow male students to have hair at any length. Exh. 1 at ¶ 23; Exh. 13 at 46:10-47:16. Superintendent Richardson felt that, based on the societal changes the population was experiencing, he did not see the need for the District to have such a strict dress code. Exh. 1 at ¶ 23; Exh. 13 at 46:10-47:16; June 15, 2020, Email, attached as Exh. 30. The revised dress code came into effect for the 2020-2021 school year. Exh. 1 at ¶ 23; Tatum ISD Dress Code for the 2020-2021 School Year, attached as Exh. 31.

M.T. returned to Tatum ISD for either Kindergarten or First Grade and is currently in the Third Grade. Exh. 5 at 14:1-5, 43:25-44:23. He has not been disciplined under the dress code for his hair since his re-enrollment. *Id.* at 195:19-23. K.C. currently attends school in the school district where he resides, Carthage Independent School District. Exh. 3 at 10:6-10.

<u>**ARGUMENT & AUTHORITIES**</u>

**A.      Standard of Review.**

Summary judgment allows the Court "to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment evidence and the inferences to be drawn from them are viewed in the light most favorable to the nonmovant. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005). However, legal conclusions, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

**B.      Students do not hold a constitutional or statutory right to wear their hair at the length or style desired.**

The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (specifically acknowledging "regulations of . . . hair style") (citing *Ferrell v. Dall. Indep. Sch. Dist.*, 392 F.2d 697 (5th Cir. 1968)); *see also Karr v. Schmidt*, 460 F.2d 609, 613–14 (5th Cir. 1972) (en banc). And the Fifth Circuit agrees. *Ferrell*, 392 F.2d at 704.

In *Ferrell v. Dallas Independent School District*, the Fifth Circuit upheld a school's hair-length regulation. *Id*. Several years later, the Fifth Circuit was "called upon to decide [whether] there [is] a constitutionally protected right to wear one's hair in a public high school in the length and style that suits the wearer." *Karr*, 460 F.2d at 613. The answer? "[N]o such right is to be found within the plain meaning of the Constitution." *Id.* To put it simply: the Fifth Circuit has considered, and rejected, the arguments advanced by Plaintiffs. *Id.* at 614–17.

Facially neutral hair policies are "invalid under the Equal Protection clause if [the] court can perceive no rational basis on which it is founded." *Id.* at 615–16. But, as noted by the Fifth Circuit, there are plenty of rational bases for hair policies. *Id.* at 613. Considering "the interference with liberty is a temporary and relatively inconsequential one," courts are "compelled to recognize and give weight to the very strong policy considerations in favor of giving local school boards the widest possible latitude in the management of school affairs." *Id.* at 615. The District has articulated its reasoning for its dress code, and, specifically, the hair length and style restrictions on male students: it instills discipline and prepares its students for the workforce and military enlistment. Exh. 13 at 58:3-7, 60:22-25; Exh. 1 at ¶ 9. This rationale has already been accepted as a rational basis for adopting and enforcing dress and grooming policies. *See* Part D *infra*.

*Karr* has been relied upon extensively over the decades and comports with decisions of multiple other circuit courts of appeals. *See, e.g.*, *Domico v. Rapides Par. Sch. Bd.*, 675 F.2d 100, 102 (5th Cir. 1982); *Zeller v. Donegal School Dist.*, 517 F.2d 600, 606 (3d Cir. 1975); *Freeman v. Flake*, 448 F.2d 258, 261 (10th Cir. 1971); *Gfell v. Rickelman*, 441 F.2d 444, 446 (6th Cir. 1971). Indeed, this Court cited *Karr* as good law just a year ago in its ruling on the District's motion to dismiss Plaintiffs' original complaint. Dkt. 37 at pp. 7–9.

Binding Fifth Circuit precedent – that is still good law – should be conclusive and courts must abide by controlling precedent absent "an intervening change in the law" that is "unequivocal." *U.S. v. Alcantar*, 733 F.3d 143, 145–46 (5th Cir. 2013). No such unequivocal intervening change in the law has occurred.[5] As such, "[e]ven [if the] Court disagrees with the

---

[5] In their complaint, Plaintiffs allege *Karr* has been "effectively overturned" by the passage of the *Texas* CROWN Act. *See* Dkt. 56 at 2, 93. This is an incorrect interpretation of the Texas CROWN Act and how prior binding precedent can be overturned by a state judiciary. Regardless, the Texas CROWN Act, when it goes into effect on September 1, 2023, will not prohibit school districts from requiring male students to have short hair, nor will it prohibit school districts from forbidding male students from wearing their hair in ponytails, which are the bases for Plaintiffs'

decision in *Karr*, the rule to be followed by district courts in this Circuit has been clearly enunciated." *Eppersen v. Pasadena Indep. Sch. Dist.*, 386 F. Supp. 317, 319 (S.D. Tex. 1974). Without an underlying constitutional or statutory right to wear their hair at the length or style desired while attending a public school district, Plaintiffs' claims fail and should be dismissed.

Against this backdrop, Plaintiffs ask this Court to recognize a new constitutional right that permits a child to wear a ponytail, pigtails, or their hair loose, on any given day of their choosing, based on how they feel that day. This Court should decline Plaintiffs' invitation to do so. As the Fifth Circuit recently explained, courts should not lightly recognize new constitutional rights and enlarge substantive due process rights. *See Fisher v. Moore*, 73 F.4th 367, 374 (5th Cir. 2023) (discussing recent Supreme Court authority that "forcefully[] underscore[s] that substantive due process is a disfavored doctrine prone to judicial improvisation"). As such, even if *Karr* did not exist, the current Supreme Court has "reiterated—with gusto—that rights protected by substantive due process must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Id.* (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)) (internal citations omitted). And a child's right to wear their hair in a ponytail is not deeply rooted in this Nation's history.

**C.      Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Section 1983 claim of race discrimination.**

In order to impose municipal liability on the District, Plaintiffs must identify sufficient evidence to raise a genuine question of material fact that the (1) the alleged constitutional violation was caused as the direct result of the execution of an official custom or policy; (2) the custom or

---

allegations. *See* Texas H.B. 567 (effective September 1, 2023), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=88R&Bill=HB567. Because there are no state law claims in this case, any evaluation of Texas' CROWN Act would amount to an impermissible advisory opinion.

policy was approved or sanctioned by the District's final policymaker; and (3) the custom or policy was the "moving force" behind the violation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997). The Fifth Circuit defines a custom or official policy as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] . . . or by an official to whom the [district] has delegated policy-making authority; or

2. A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [district] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the district or to an official to whom that body had delegated policy-making authority.

*Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995). The Board is the District's final policymaker for the purpose of analyzing municipal liability. *See Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 759 (5th Cir. 1986).

This Court has already found the District's policy to be facially race neutral and, as such, Plaintiffs' race claim must rest on a disparate treatment theory. *See* Dkt. 28. Therefore, even assuming hair length, and the ability to wear hair in a ponytail, deserves constitutional protection, Plaintiffs must prove that the District's Board had actual or constructive knowledge of a persistent, widespread practice, of highly-similar violations of Black students' constitutional right to wear their hair at the length or in a ponytail as desired, by District officials or employees, that was so common and well settled as to constitute a custom that fairly represented District policy. *See Eugene*, 65 F3d at 1304. As shown below, the evidence does not support such a claim.

> *1. There is no evidence to show the Board had actual or constructive knowledge of the alleged constitutional violations against Plaintiffs.*

At best, the evidence reflects that, during the Fall of 2019, Ms. Woodley and Ms. Cox attended two Board meetings and presented their Level III grievance to the Board. Exh. 5 at 171:14-172:1; Exh. 3 at 53:14-54:6; Exh. 13 at 182:7-20, 187:9-188:4; September 9, 2019, Board

Meeting Minutes, attached as Exh. 32; September 9, 2019, Board Video, attached as Exh.33; September 16, 2019, Board Meeting Minutes, attached as Exh. 34; September 16, 2019, Board Video, attached as Exh. 35. As shown below, none of these presentations imputed actual or constructive knowledge of the alleged constitutional violations against Plaintiffs prior to the withdrawal of M.T. and K.C. from the District.

Ms. Woodley spoke during public comment at the September 9 and 16, 2019, Board meetings. Exhs. 32-35. On September 9, 2019, Ms. Woodley stated she believed the dress code was discriminatory on the basis of sex because it did not allow M.T. to wear his hair long. Exh. 33. However, Ms. Woodley stated she was given the option of braiding M.T.'s hair so that he was in compliance, rather than cutting his hair. *Id*. Ms. Woodley also stated that she believed the dress code was discriminatory on the basis of race but did not provide any further detail. *Id*. On September 16, 2019, Ms. Woodley merely addressed the room to defend her allegation that Dr. Richardson stated a third option was for M.T. to wear a dress and identify as a girl transitioning. Exh. 35. Neither of Ms. Woodley's public statements impute constructive or actual knowledge to the Board of M.T.'s (or K.C.'s) constitutional rights being violated.

The only other time Ms. Woodley or Ms. Cox spoke before or to the Board was during their Level III grievance hearing, held on October 21, 2019. Exh. 25. However, the grievance documents submitted for both M.T. and K.C. simply state that they did not want to pin their hair to comply with the dress code because it was more comfortable to have their hair loose and down, and that neither of them wanted to cut their hair because it was "a part of who [they are]." Exhs. 22-23. Nothing in the grievance documents suggests M.T. and K.C. wore their hair for a cultural, spiritual, or religious reason, or to express any particular message. *Id*. Similarly, during the Level III hearing, there was no evidence presented to the Board that M.T. and K.C. wore their hair for a

cultural, spiritual, or religious reason, or to express any particular message. Exh. 24. What is more, there was no evidence presented, or argued, that the District's hair policy was racially discriminatory. *Id*. The focus of Plaintiffs' presentation was regarding the reasons behind their administrative withdrawals – i.e., Plaintiffs' allegation that the District retaliated against them for protesting the dress and grooming code. *Id*. This is insufficient to establish the Board had actual or constructive knowledge of the alleged constitutional violations against Plaintiffs and Plaintiffs' Section 1983 race discrimination claims fail.

> 2. *Even if the evidence showed the Board had actual knowledge (and it does not), Plaintiffs cannot prove a persistent, widespread pattern or practice of highly similar unconstitutional behavior by District officials or employees.*

A pattern of <u>prior, highly similar</u> incidents is necessary to show both a customary policy and deliberate indifference. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 382-85 (5th Cir. 2005); *Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010). A pattern of prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to [the Board] of knowledge that the objectionable conduct is the expected, accepted practice of [District employees]." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (insertions added). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Id.* (internal quotations omitted) (citing *Estate of Davis*, 406 F.3d at 383); *see also Connick v. Thompson*, 563 U.S. 51, 62-63 (2011) Further, a pattern requires "sufficiently numerous prior incidents, as opposed to isolated instances." *Id.* (internal quotations omitted).

There is no evidence to establish the District's dress and grooming code prohibiting male students from wearing their hair below their shoulders or in a ponytail was disproportionately

enforced against African American students, or that the Board was aware of such a pattern or practice by District employees. At best, the discipline data for the following school years show the following, for both male and female students at the high school and middle school campuses:

2017-2018 School Year:
- 5 Black/African American male students were disciplined under the hair policy: one for wearing a ponytail, one for wearing a bun, one for length (below collar), one for wearing two puffballs, one for having red hair.
- 2 White students were disciplined under the hair policy: one for wearing a ponytail (male) and one for having pink hair (female).

2018-2019 School Year:
- 1 Black/African American female student was disciplined under the hair policy for having pink hair.
- 1 White male student was disciplined under the hair policy for having a ponytail.

2019-2020 School Year:
- 1 White female student was disciplined under the hair policy for having an unnatural hair color.

2020-2021 School Year:
- 1 African American female student was disciplined under the hair policy for having "fire red" hair.

2021-2022 School Year:
- No violations

Discipline Data for 2017-2022 School Years, attached as Exh. 36.

This is insufficient to establish, much less with any statistical significance, that African American students were disproportionately affected by the District's former dress code – in any manner or in the specific manner of which Plaintiffs complain (i.e., length and ponytail). Further, there is no evidence that this data was presented to the Board.

To the extent Plaintiffs attempt to claim the former language prohibiting ponytails, ducktails, rat-tails, male buns, or puffballs is discriminatory against any particular race of student, both Ms. Woodley and Ms. Cox testified that those styles could be worn by any race of student.

Exh. 3 at 85:24-87:17, 105:8-15; Exh. 5 at 117:2-124:25[6]. As such, there is no evidence to support Plaintiffs' race discrimination claim and their Section 1983 claim fails.

> 3. *Even if Plaintiffs could establish a persistent and widespread pattern of unconstitutional behavior known by the Board (and they cannot), the evidence conclusively establishes that the District did not act with deliberate indifference to their constitutional rights.*

To establish deliberate indifference, Plaintiffs must show that the District was more than ineffective or negligent. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454, 458 (5th Cir. 1994); *see also Hagan v. Houston Indep. Sch. Dist.*, 51 F.3d 48 (5th Cir. 1995). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Estate of Davis,* 406 F.3d at 381 (quoting *Brown*, 520 U.S. at 410) (internal quotations omitted). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). School officials do not have a constitutional duty to prevent further harm to a student. *See Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998). In this case, there is no evidence that the District or its employees were deliberately indifferent to Plaintiffs' constitutional rights. In fact, the evidence negates this.

Far from deliberate indifference, the undisputed evidence shows that race was never at play in this case. K.C. was sent to the Redirect Room for wearing his hair in a ponytail or pigtails, on one day, and only after Ms. Cox declined the opportunity to come to the school and fix K.C.'s hair so that he was in compliance. Exh. 10 at ¶¶ 12-20; Exh. 3 at 66:25-67:5, 68:7-12. It is further undisputed that if K.C. wore his hair down there were never issues and Ms. Cox was never

---

[6] Ms. Woodley stated that "upon her belief" no other race besides African Americans can wear their hair in puffballs. Exh. 5 at 121:23-122:8. However, Ms. Woodley also testified that the puffball hairstyle was dependent on the texture of hair, and not the race of the individual. Exh. 5 at 120:10-121:2. And District employees agree. Exh. 27 at 41:12-45:4; Exh. 37 at 44:3-17.

contacted. Exh. 10 at ¶ 12; Exh. 3 at 28:11-21, 48:16-49:3, 58:20-59:2, 61:8-62:17. Additionally, it is undisputed that K.C. liked wearing his hair in a ponytail only out of comfort, particularly when it was hot outside. Exh. 3 at 55:11-56:1, 63:3-24.

It is also undisputed that M.T. was sent to the Redirect Room for wearing his hair in a ponytail, for 6 days, and only after Ms. Woodley declined the opportunity to come to the school and fix M.T.'s hair so that he was in compliance. Exh. 10 at ¶¶ 21-42; Exh. 5 at 149:9-151:23, 156:3-158:13. It is further undisputed that M.T. was provided an option to braid his hair to stay in compliance with the dress code and that Ms. Woodley did this for at least a month without issue. Exh. 10 at ¶¶ 21-42; Exh. 5 at 149:9-151:23, 156:3-158:13. Additionally, it is undisputed that the District, at its own expense, provided M.T. with a substitute teacher while he was in the Redirect Room. Exh. 10 at ¶¶ 35-42.

Lastly, it is undisputed that the language prohibiting ponytails, ducktails, rat-tails, male buns, or puffballs was removed from the District's dress code as of November of 2019. Exhs. 26, 28-29; Exh. 1 at ¶ 21. What is more, the hair length restrictions for male students was removed from the District's dress code as of June of 2020. Exh. 31; Exh. 1 at ¶ 23.

**D.    Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Section 1983 claim of sex discrimination, because although the District's former hair length restriction treated male and female students differently, on its face, it did not amount to invidious discrimination against male students.**

When analyzing Plaintiffs' constitutional claim for sex discrimination, the Court must apply the rational basis test. *See, e.g.*, *Fenceroy v. Morehouse Par. Sch. Bd.*, No. 05-0480, 2006 WL 39255, at *1 (W.D. La. Jan. 6, 2006) (acknowledging that "*Karr* and *Stevenson* [*v. Board of Education of Wheeler County, Georgia*, 426 F.2d 1154 (5th Cir. 1970)] stand for the proposition that grooming regulations at the high school level do not deprive the plaintiffs of any

constitutionally recognized rights in the first place") (citing *Davenport v. Randolph Cty. Bd. of Educ.*, 730 F.2d 1395, 1397 n.3 (5th Cir. 1984)); *see also Zeller*, 517 F.2d at 606; *Freeman*, 448 F.2d at 261; *Gfell*, 441 F.2d at 446.[7]

However, even if a heightened standard of review did apply, the District would easily meet it. The District has already articulated several bases for its former dress and grooming code, including: (1) community expectations; (2) student success; and (3) career readiness. Exh. 1 at ¶¶ 6-10. All of these have been held sufficient to withstand intermediate scrutiny. *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435–36 (9th Cir. 2008); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005); *Canady v. Bossier Parish Sch. Dist.*, 240 F.3d 437, 443 (5th Cir. 2001).[8] And if the District's stated reasoning withstands intermediate scrutiny, it most certainly withstands the rational basis test.

In *Jacobs v. Clark County School District*, the Ninth Circuit considered whether a school's uniform policies "advance[d] important government interests" sufficient to withstand intermediate scrutiny. 526 F.3d at 435. The school's purported reasons for the uniform policies were (1) increasing student achievement; (2) promoting safety; and (3) enhancing a positive school environment. The court acknowledged that all three goals were more than sufficient to overcome intermediate scrutiny. The Ninth Circuit relied upon the Fifth Circuit's related decision in *Canady*. 240 F.3d at 443 (the Fifth Circuit acknowledged that the goals of "increas[ing] test scores and

---

[7] The District acknowledges that the circuit courts of appeals are split on this issue. 50 Rich. L. Rev. 1039, 1054 (2016) (acknowledging the circuit split and the "open question" in scholarly circles regarding the proper standard of review given the split). Perhaps the Supreme Court will eventually resolve the split. In the meantime, the Fifth Circuit's mandate is straightforward. The Court does not have the discretion to disregard *Karr* barring an unequivocal statement from the Supreme Court or the Fifth Circuit expressly overruling it. *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016).

[8] In this circuit, courts apply *Karr* to school hair-length cases, which applies the rational basis test for hair-length regulations. Therefore, when analyzing hair-length regulations under the intermediate scrutiny test, to ascertain what justifications would be sufficient, the District relies on out-of-circuit authority and analogous cases.

reduc[ing] disciplinary problems throughout the school system" were "undoubtedly [] important interest[s]" served by a dress code). The Ninth and Fifth Circuits are not alone in this regard. *See, e.g.*, *Blau*, 401 F.3d at 391–92 (the Sixth Circuit acknowledged that "increasing school unity and pride, . . . [and] improving test scores . . . are all important governmental interests [served by a school uniform policy]").

Here, the District has offered ample evidence demonstrating that its hair length restrictions for male students was tied to important government interests. Exh. 1 at ¶¶ 6-10. By contrast, Plaintiffs have not adduced any evidence that men and women do not face comparable burdens under the prior District's dress code generally. *Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1110 (9th Cir. 2006) (en banc). As such, their claim must fail.

E.      **Even if it were actionable, the undisputed evidence does not raise a genuine question of material fact to support Plaintiffs' Title VI claim.**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d. There is no evidence that the District intentionally discriminated against Plaintiffs based on their race.

> 1.   *Even if the law did support a Title VI claim based on hair length (and it does not), there is no evidence that the District or its employees discriminated, let alone intentionally discriminated, against Plaintiffs, or any other student, based on their race.*

"Only racial discrimination of the same character as that forbidden by the Equal Protection Clause is prohibited by [Title VI]." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 639 (5th Cir. 2021). "Accordingly, '[t]o receive compensatory damages, a Title VI plaintiff must prove discriminatory intent.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th

Cir. 2015). "Title VI allows neither personal liability claims against individuals nor vicarious liability claims against employers for the acts of their employees." *Rodgers v. Smith*, 842 F. App'x 929 (5th Cir. 2021); *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021) (collecting cases).

Put simply, and plainly, there is no evidence that the District or any of its employees intentionally discriminated against M.T., K.C., or any other student based on their race. *See* Part C.2 *supra.* With no evidence, their Title VI claim must be dismissed.

> 2. *What is more, Plaintiffs' Title VI claims should be dismissed because mental anguish damages are not recoverable under Title VI.*

M.T. and K.C. request compensatory damages for injuries allegedly sustained due to the District's conduct. *See* Dkt. 56 at Prayer for Relief. However, under Supreme Court authority, as a matter of law, M.T. and K.C. cannot recover mental anguish damages under statutes that were enacted pursuant to the Spending Clause – such as Title VI (or Title IX). *See Cummings v. Premier Rehab Keller, PPLC*, 142 S. Ct. 1562, 1569-76 (2022). As M.T.'s and K.C.'s injunctive relief and declaratory relief claims are now moot (*see* Part I *infra*), they are not entitled to recover any other damages under Title VI (or Title IX) and these claims should be dismissed. *Id.*

**F.      Even if it were actionable, the undisputed evidence as applied to the current state of law does not raise a genuine question of material fact to support Plaintiffs' Title IX claim.**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "Congress's purpose in passing Title IX was to address significant concerns about discrimination against women in education." Tex. Att'y Gen. Op. No. KP-0396 (2021) (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523–24 (1982)). It does not apply to hair-length regulations. The United States Department of Education (the DOE) has already concluded that

Title IX does not apply to appearance codes. Further, in addition to *Karr* and its progeny, analogous case law in the Title VII context finds that local policies addressing hair length are not sex discrimination within the meaning of Title VII. As such, even though the former hair length and style restrictions for students only applied to males, Plaintiffs' Title IX claim still fails.

> 1. *The purpose behind Title IX and the current state of law in the analogous employment context does not support Plaintiffs' claims that restrictions on hair styles or hair length are discriminatory based on gender.*

Over four decades ago, the DOE adopted a regulation that prohibited discrimination "in the application of codes of personal appearance." 39 Fed. Reg. 22228, 22229 (June 20, 1974). Only one case construed those regulations before they were later rescinded – *Trent v. Perritt*, 391 F. Supp. 171 (S.D. Miss. 1975). The *Trent* court was called on to answer whether "a county-wide school grooming regulation which prohibits male students from wearing hair below the ear lobe or over the collar" violated the Equal Protection Clause or Title IX. *Id.* at 171. The plaintiffs in that case pointed to the DOE regulations for support. *Id.* at 173. The *Trent* court acknowledged that "it is obvious that boys' hair is treated differently than girls'" and "the difference is based on sex." *Id.* The court nonetheless found the regulations contrary to Title IX's plain language:

> If the word 'appearance' in the proposed [] regulations quoted in part above and not to this Court's knowledge yet adopted, means grooming and proposes to erase all outside physical distinctions between the sexes, it aims at a ridiculous result, one of stereotyping both sexes into one, with little relation to the purpose of the federal funding.

*Id.*

The DOE subsequently withdrew its regulations. 47 Fed. Reg. 32526-02, 32526–27 (July 28, 1982). In so doing, the DOE acknowledged that "[d]evelopment and enforcement of appearance codes is an issue for local determination." *Id.* at 32526. It reasoned that its prior regulations contradicted Title IX's plain language and legislative history. Specifically, the DOE

wrote that "[t]here is no indication in the legislative history of Title IX that Congress intended to authorize Federal regulations in the area of appearance codes." *Id.* at 32527. Furthermore, the DOE mirrored the Fifth Circuit and Justice Black's concerns in *Karr* and characterized regulating "codes of personal appearance" as unimportant. Revoking the regulation allowed the DOE to "concentrate on enforcing Title IX in cases involving more serious allegations." *Id.* at 32526. Over twenty other federal agencies agree with the DOE's interpretation of Title IX. 82 Fed Reg. 46655 (Oct. 6, 2017); 65 Fed. Reg. 52858-01, 52858 (Aug. 30, 2000).[9]

Courts and scholars alike agree with the DOE: "Title IX has been rendered largely ineffective as a method of challenging dress codes." Carolyn Ellis Staton, *Sex Discrimination in Public Education*, 58 MISS. L.J. 323, 332 (1998). Part of that is due to the DOE's guidance indicating that Title IX was never intended to apply to dress codes. The other part relates to the fact that analogous case law from the Title VII context counsels against its application.

Courts construing Title IX consider cases from the Title VII context. *Wang v. Bethlehem Cent. Sch. Dist.*, No. 1:21-CV-1023-LEK-DJS, 2022 WL 3154142, at *36 (N.D.N.Y. Aug. 8, 2022) (collecting cases). Case law uniformly holds that policies similar to the District's hair length regulations for male students do not offend Title VII.

The Fifth Circuit addressed an employer's policy implementing different male and female grooming standards in *Willingham v. Macon Telegraph Publishing Company*. 507 F.2d 1084 (5th Cir. 1975) (en banc). Title VII, the Fifth Circuit acknowledged, was designed "to achieve equality

---

[9] Title IX is unambiguous that it does not apply to dress codes. To the extent Plaintiffs disagree, the DOE's guidance indicating that Title IX does not apply to "appearance codes" is entitled to *Chevron* deference. Under the *Chevron* doctrine, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). As acknowledged by the dozens of federal agencies adopting the DOE's interpretation of Title IX, "[t]he recipient community, Federal agencies, and the courts should have the benefit of continued reliance on past interpretations of Title IX and its regulations, and using [the DOE's] regulations as the model for other agencies promotes that consistency." 65 Fed. Reg. at 52859.

in employment opportunities and remove barriers" and "provide equal access to the job market for

both men and women." *Id.* at 1091 (citations omitted). But the Fifth Circuit held that Title VII

provided no recourse to complaints about an employer's hair-length requirements:

> [A]n employer cannot have one hiring policy for men and another
> for women if the distinction is based on some fundamental right. But
> a hiring policy that distinguishes on some other ground, such as
> grooming codes or length of hair, is related more closely to the
> employer's choice of how to run his business than to equality of
> employment opportunity . . . Hair length is not immutable and in the
> situation of employer *vis a vis* employee enjoys no constitutional
> protection. If the employee objects to the grooming code he has the
> right to reject it by looking elsewhere for employment, or
> alternatively he may choose to subordinate his preference by
> accepting the code along with the job.

*Id.*

   *Willingham* has been relied upon repeatedly since being announced. *Harper v. Blockbuster

Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998) ("differing hair length standards for men and

women do not violate Title VII, a holding which squarely forecloses the plaintiffs' discrimination

claim"); *see also EEOC v. Catastrophe Mana. Sols.*, 852 F.3d 1018, 1028–29, n.4 (11th Cir. 2016)

(reaffirming *Willingham* and *Harper*); *Jespersen*, 444 F.3d at 1109-10 (employers and schools

alike "may differentiate between men and women in appearance and grooming policies); *Hanson

v. Highland Home Holdings, Inc.*, No. 3:96-CV-0011-D, 1997 WL 86456, at *2 (N.D. Tex. Feb.

26, 1997) ("An employer's different grooming preferences for males and females are not

prohibited by Title VII.").

   Additionally, the EEOC no longer pursues gender discrimination claims based on different

employer grooming standards. The EEOC succinctly explains in its guidance that,

> the circuit courts of appeals have unanimously concluded that
> different appearance standards for male and female employees,
> particularly those involving hair length where women are allowed

> to wear long hair but men are not, do not constitute sex discrimination under Title VII.

Equal Emp't Opp. Comm., *CM-619 Grooming Standards* (1989).

M.T.'s and K.C.'s Title IX arguments stand against a veritable army of contrary authorities. As explained above, minor students cannot be entitled to rights that have been uniformly denied to adults. *Tinker*, 393 U.S. at 506; *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). Their Title IX claims must fail.

> 2. *What is more, Plaintiffs' Title IX claim should be dismissed because mental anguish damages are not recoverable under Title IX.*

M.T. and K.C. request compensatory damages for injuries allegedly sustained due to the District's conduct. *See* Dkt. 56 at Prayer for Relief. However, under Supreme Court authority, as a matter of law, M.T. and K.C. cannot recover mental anguish damages under statutes that were enacted pursuant to the Spending Clause – such as Title IX (or Title VI). *See Cummings*, 142 S. Ct. at 1569-76. As M.T.'s and K.C.'s injunctive relief and declaratory relief claims are now moot (*see* Part I *infra*), they are not entitled to recover any other damages under Title IX (or Title VI) and these claims should be dismissed. *Id.*

**G.    Even if it were actionable, the undisputed evidence as applied to the current state of law does not raise a genuine question of material fact to support Plaintiffs' First Amendment claim.**

> 1. *Under binding precedent, hair length and style does not objectively communicate any message that enjoys First Amendment protection.*

M.T. and K.C. claim the District's former hair length regulations and style restrictions for male students infringed on their First Amendment "right to express themselves freely without repercussions from the government." *See* Dkt. 56 at 141. However, the Fifth Circuit holds that the First Amendment does not shield a high school student's decision to wear long hair or any other chosen hair style. *Karr*, 460 F.2d at 613-14 (relying in part on *Tinker*, 393 U.S. at 509); *Ferrell*,

392 F.2d at 704-05 (school district did not violate First Amendment by prohibiting male students from wearing the "Beatle type haircuts"). In doing so, the Fifth Circuit rejected the exact same argument made by M.T. and K.C. here, that "the wearing of long hair is symbolic speech by which the wearer conveys his individuality, his rejection of conventional values, and the like." *Karr*, 460 F.2d at 613-14. That is because the wearing of long hair or a particular hair style does not objectively communicate any message that enjoys constitutional protection under the First Amendment. *Id*. As the Fifth Circuit in *Karr* pointed out, "[f]or some, no doubt, the wearing of long hair is intended to convey a discrete message to the world. But for many, the wearing of long hair is simply a matter of personal taste or the result of peer group influence." *Id*. at 613-14.

Binding precedent makes this clear: whatever a person's motivation for wearing a particular hair style, it simply does not give rise to First Amendment protection. Without expressive conduct that is objectively understood as communicating a clear message, M.T.'s and K.C.'s First Amendment claims are not cognizable and this Court must dismiss their First Amendment claims.

2. *Even if hair length and style objectively communicated any message that enjoys First Amendment protection, the undisputed evidence does not support that M.T. communicated his intent to wear his hair at a certain length as a discrete message to the world.*

It is undisputed that M.T., as a then-4-year-old child, did not seek to communicate any particular message by having long hair or wearing it in a ponytail. Exh. 5 at 115:3-5, 158:15-160:7. As such, his First Amendment claim fails.

3. *Even if hair length and style objectively communicated any message that enjoys First Amendment protection, the undisputed evidence does not support that K.C. communicated his intent to wear his hair in a ponytail as a discrete message to the world.*

It is undisputed that K.C., as a then-5-year-old child, did not seek to communicate any

particular message by having long hair or wearing it in a ponytail. Exh. 3 at 55:11-56:1, 63:3-21, 105:4-15. As such, his First Amendment claim fails.

    4. *Regardless, there is no evidence to establish municipal liability against the District for alleged violations of Plaintiffs' First Amendment constitutional rights.*

Just as there is no evidence to support Plaintiffs' municipal liability claim for race discrimination, there is equally no evidence to support a claim of municipal liability for violations of Plaintiffs' right to Free Speech. *See* Part C *supra*. Plaintiffs' can point to no evidence that would establish the District's Board had actual or constructive knowledge of a persistent, widespread practice, of highly-similar violations of Black students' constitutional rights to express themselves through the length or style of their hair. *Id*. As such, Plaintiffs' First Amendment claim fails.

## H. To the extent M.T. is now attempting to bring a claim for religious discrimination, it is not adequately pled and the evidence conclusively establishes a reasonable accommodation was given.

Plaintiffs make oblique references to "spirituality" in their pleadings and, during her deposition, Ms. Woodley testified that she follows some – but not all – tenants of the Rastafarian religion, including that male and females cannot cut their hair. Exh. 5 at 60:12-63:4; Dkt. 56 at 6, 11-13, 38, 41-44, 107-108, 151, 153-156. This was never pled, nor does M.T. bring a claim for religious discrimination. *See generally* Exh. 56. Regardless, Ms. Woodley testified that she never communicated her Rastafarian beliefs and practices to Ms. McCoy, Principal Fite, Dr. Richardson, or even her Pastor at New Smith Chapel. Exh. 5 at 63:5-9, 80:12-14, 84:22-85:5, 91:8-11, 97:19-23. Ms. Woodley did testify that she told Mr. Fite, on some unestablished date, that she was Rastafarian, but that she did not go so far as to submit a religious exemption request for M.T. to be exempted from the dress code. Exh. 5 at 109:1-111:3. Mr. Fite testified that, had she done so, it would have been granted. Exh. 27 at 21:5-26:7.

Nonetheless, it is undisputed that Ms. Woodley's practice of aspects of the Rastafarian

religion does not prohibit males from wearing their hair in braids. Exh. 5 at 69:8-70:3. As such, Ms. Woodley herself testified that the option provided to M.T. to be in compliance with the dress code, without the necessity of cutting M.T.'s hair, was reasonable and acceptable under her religion. *Id.*; *see also, e.g., Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986) ("[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end."). This is fatal to any religious discrimination claim.

I.     **As the District has already amended its dress code to remove the relevant language, K.C. no longer attends school within the District, and Plaintiffs' claims do not establish an actual controversy, their request for declaratory relief should be denied.**

When considering a declaratory judgment action, a district court must decide: "(1) whether an actual controversy exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Frye v. Anadarko Petro. Corp.*, 953 F.3d 285, 294 (5th Cir. 2019). K.C. does not attend school within the District. Exh. 3 at 10:7-10. Additionally, the District revised its dress code to remove the language prohibiting specific hair styles for male students, in November of 2019, and remove the length restrictions for male students, in June of 2020. Exh. 1 at ¶¶ 21, 23. Further, as established above, none of Plaintiffs' claims are actionable. As such, the Court lacks the authority to, and should exercise its broad discretion and refuse to, enter declaratory judgment as it relates to their claims.

## CONCLUSION AND PRAYER

For the above reasons, Tatum Independent School District requests the Court grant it summary judgment as to all of Plaintiffs' remaining claims, dismiss all of Plaintiffs' claims, and award any other relief the District is entitled to.

Respectfully submitted,

ROGERS, MORRIS, & GROVER, L.L.P.

_____
JONATHAN G. BRUSH
State Bar No. 24045576
Fed. I.D. No. 619970
jbrush@rmgllp.com
AMY DEMMLER
State Bar No. 24092337
Fed. I.D. No.  3227731
ademmler@rmgllp.com
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone:      713/960-6000
Facsimile:      713/960-6025

ATTORNEYS FOR TATUM ISD

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

_____
Attorney for Tatum ISD