IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| M.T., a minor by and through his grandmother and next friend, EDWINA WOODLEY, et al., § § § | | |
| Plaintiffs, § § | | |
| vs. § | C.A. NO.: 2:21-cv-00364 | |
| § | | |
| TATUM UNIFIED SCHOOL DISTRICT, § § | | |
| Defendant. § | | |

**PLAINTIFFS' OPPOSITION TO TATUM INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Tatum Independent Unified School District (TISD) regards the Plaintiffs as bunch of Black race agitators who fraudulently enrolled in TISD with the intent of challenging TISD's unconstitutional grooming policy. Plaintiffs vehemently oppose Defendant's characterization of their valid enrollment in TISD and their constitutionally protected desire to express their African American culture and spirituality through their hairstyles. These factual disputes alone mandate a trial on the merits. This is because when deciding a motion for summary judgment, the Court must avoid a "trial on affidavits" as "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are tasks for the trier-of-fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Furthermore, at Summary Judgement the Court must resolve any all disputes over material facts in the Plaintiffs' favor. *Leonard v. Dixie Well Service Supply, Inc.,* 828 F.2d 291, 294 (5th Cir. 1987). Accordingly, the Court must find, for the purposes of this motion, that the Plaintiffs properly enrolled in TISD and were expressing their

1

African American culture and spiritualty through their hairstyles while intending TISD. The only question to be decided on this motion is if TISD's involuntary removal of the Plaintiffs from TISD for expressing their African American culture and spiritualty through their hairstyles was unconstitutional.

**II.    STATEMENT OF FACTS**

In 2019, M.T.'s and K.C.'s guardian attempted to enroll the children in TISD. (See Ex. D., Woodley Depo., 180:13-181:20-22; 182:5-25; 184:1-11)(See Ex. E, Cox Depo., 29:7-25-30:1-18)(See Defendant's Ex. 6). TISD employee Denise McCoy was assigned to direct the respective families' application process. Id. Ms. McCoy instructed the families step by step on how to enroll the children in TISD. Id. After following Ms. McCoy's instructions to the letter both children were enrolled in TISD without objection. Id.

In 2019-2020 Tatum ISD maintained grooming and residential admission policies that were exclusively enforced against its undesired Hispanic and African American students. (See Ex. F, TISD 404, 406, 409, 410, 821-826). Pursuant to Tatum ISD's Board Policy Manual and Student Code of Conduct, Superintendent Richardson and the Tatum ISD Board possess final authority to establish standards and policy with respect to student dress and grooming. (DKT 56, ¶ 82). Tatum ISD's Board, as the official policymaker for the school district, adopted the 2019-2020 dress code/hair policy that targeted male Black students and their natural hair growth, making it difficult for male Black students to freely express themselves and comply with the dress code. Tatum ISD's adoption of the 2019-2020 hair policy was motivated, at least in part, by the racial and gender discriminatory goal of restricting Black male students from wearing their natural hair or culturally significant hair formations. (DKT 56, ¶ 83).

Plaintiffs M.T. and K.C. who were respectively 4 and 5 years old at the time of the events in the instant action took place, were involuntarily removed from TISD for refusing to comply with TISD's hair length policy and violations of TISD's residency policy FD Legal and FD Local.  At the deposition of TISD Assistant Superintendent Drennon Fite, admitted that the grooming policy was never to be applied to elementary students because "at that level you don't want to hold those kids accountable because at their age you want —that's not really their responsibility."  (See Ex. A, 58:7 - 59:1-7).  TISD has provided no explanation as to why the policy was only ever applied to the two African American plaintiffs in the instant action. (See Ex. A, Fite Depo., 78:18-81:1)

The residency issue was just utilized as pretext once the students continue to challenge the District's unconstitutional grooming policy. J.P. Richardson asserted in his declaration in support of Defendant's Motion for Summary Judgment that "Because the District is a steward of public funds, the District routinely conducts residency checks of enrolled students – for both transfer students and students who live within the District." (See Defendant's Ex. 1, ¶ 17). Assistant Drennon Fite testified that this is not true as the district does not do routine residency checks of enrolled students.  (See Ex. B, Fite Depo., 43:11-25).   Mr. Fite further admitted that there are no documentations of any routine residency checks, because it's not included in TISD's policy. Id.

The TISD Board of Directors voted unanimously to remove the plaintiffs who they viewed as unruly African American students, for their disruptive hairstyles.  During their grievance process before the Board, the children and their families were labeled as fraudster race agitators, who were attempting to unlawfully upset the good ole' Confederate way of life of keeping black students in line in Tatum.   After being involuntary removed from their classrooms

and not allowed to obtain an education in TISD, M.T. and K.C. filed administrative grievances with Tatum ISD per their policy. These grievances were made on the basis that these two students were discriminated against based on their gender and race, as they were unenrolled from Tatum ISD for challenging the hair policy which explicitly discriminated against Black male students. (See Ex. E, Cox Depo., 91:6-92:17). The grievances were heard at a Level 3 before the Board of Tatum ISD on October 21, 2019. On October 23, 2019, the Board of Tatum ISD voted to deny both M.T.'s and K.C.'s Level 3 grievances. No reasoning nor findings were provided for the denial. (DKT 56, ¶ 60). During the grievance process, M.T.'s and K.C.'s representatives gave several examples to Tatum ISD, during a student grievance hearing, of students outside of Plaintiffs' protected classes who were allowed to attend school while violating Tatum ISD's grooming policy, while M.T. and K.C. were not allowed to attend school. (See Ex. E, TISD 404, 406, 409, 410, 821-826)(See Ex. J, K, and L).

After reviewing this evidence of discrimination, Defendant Tatum ISD's trustees voted unanimously to: (1) ratify the 2019-2020 dress and hair code policy that led to the unenrollment of M.T. and K.C.; (2) condoned and ratified the unconstitutional enforcement of the 2019-2020 hair policy against M.T. and K.C.; and (3) chose not to similarly enforce Tatum ISD's grooming policy against white male students who were violation of the policy and identified by Plaintiffs. (DKT 56, ¶ 110). What is troubling about the Board's involuntary removal of Plaintiff's M.T. and K.C. from TISD is that the grooming policy was not supposed to ever be applied to elementary school students[1] and has only been enforced on African American students in elementary school. (See Ex. C, TISD 30(b)(6) Depo., 38:5-12).

---

[1] At the deposition of TISD Assistant Superintendent Drennon Fite, finally admitted that the grooming policy was never to be applied to elementary students because "at that level you don't

After the Plaintiffs were withdrawn from the district, TISD Superintendent J.P. Richardson admitted that TISD's grooming policy was unlawful:

> I have been pretty adamant about not changing the dress code for next year. If you would have asked me 6 months ago, I would have said to keep it the same. However, in the midst of what our country is going through right now. I have begun to change my thought process. Transgender students can have long hair so why can't other students have long hair. You can legally get a tattoo at 18 in Texas. There is no age or sex requirement to get your ears pierced.
>
> […]
>
> I always want to stay on the forefront and try to head off any issues that I might see coming our way. I can see if we allow long hair and not earrings then we will be fighting earrings. The same can go for tattoos. You may remember the day when women were frowned upon for wearing pants. They were required to wear dresses. Times changed then. I know that in history the **slave owners did not always allow the slaves to have long hair**. Would we now be possibly classified as slave owners? Could others challenge different aspects of the current dress code and put TISD in a negative manner once again? Will school dress codes be challenged for racial inequality in the near future? Today's Supreme Court ruling also scares me if a school district is ever challenged.

(See Ex. B, TISD 1188-1189).

On May 27, 2023, Governor Greg Abbott signed into law the CROWN Act (House Bill No. 567), making Texas the twenty-first state to ban racial discrimination based on hair texture or hairstyle in schools, employment, and housing. The ("CROWN") Act, stands for Creating a Respectful and Open World for Natural Hair amends the definition of race in state antidiscrimination statutes to include traits historically associated with race, including hair, texture and protective hairstyles, including but not limited to "braids, locs, and twists." The purpose of the act is to combat race-based discrimination and bias based on hair texture and hairstyle.

---

want to hold those kids accountable because at their age you want —that's not really their responsibility."  (See Ex. A, 58:7 - 59:1-7).

Prior to the signing of the Crown Act, African American male students in Tatum ISD have been disproportionately targeted (including high school and middle school) and penalized for violating grooming policies that have been designed to, and have the effect of, profiling, singling out, and burdening African American male children for wearing their hair in its natural state. The length of students' hair or their hairstyle have no bearing on students' capacity to learn, yet these wholly arbitrary grooming policies limit the mobility of African American male children in public and private spaces, deny them equal educational opportunities, and strike at the freedom and dignity of African American people.

### III. LAW AND ARGUMENT

#### A. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 189 (5th Cir. 1996). On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 246 (5th Cir. 2003); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." *Rivera,* 349 F.3d at 247. The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d

313, 315 (5th Cir. 1995); *see also Brown v. Houston,* 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment"). Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. *Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 399 (5th Cir. 2000).

As stated above, in deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Kevin M. Ehringer Enters. v. McData Servs. Corp.,* 646 F.3d 321, 326 (5th Cir.2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

  **B. TISD Did Not Meet It's Burden Of Proving There Is No Genuine Issue of Material Fact On Plaintiffs' Race Discrimination Claims**

   **1. Equal Protection**

"The Equal Protection Clause directs that persons similarly situated should be treated alike." *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999). "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Id. Thus, a plaintiff asserting an equal protection claim must establish "that he was treated differently than persons similarly situated to him [ and] that such treatment stemmed from discriminatory intent." *Id.* The central purpose of the provision "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Lewis v. Ascension Par. Sch. Bd.,* 806 F.3d 344, 353 (5th Cir. 2015). "Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition and are subject to strict scrutiny." *Id.* at 354. To satisfy strict scrutiny

review, "the burden is on the government to prove that its actions are narrowly tailored to achieve a compelling government interest." *Id*.

Where, however, a governmental action is facially neutral (in that it does not classify based on race), the plaintiff must show that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Id.* If the plaintiff makes these showings, the governmental action violates the Equal Protection Clause unless the action can survive strict scrutiny review; that is, unless it is narrowly tailored to achieve a compelling government interest. *Id.* If the plaintiff cannot show both discriminatory effect and purpose, the equal protection claim must fail unless the plaintiff can prove that the challenged action is not rationally related to a legitimate government purpose. *Id.*

During the grievance process the Plaintiffs presented evidence of gender and race discrimination. (See Ex. E, TISD 404, 406, 409, 410, 821-826)(See Ex. J, K, and L). After reviewing this evidence of discrimination, Defendant Tatum ISD's trustees voted unanimously to: (1) ratify the 2019-2020 dress and hair code policy that led to the unenrollment of M.T. and K.C.; (2) condoned and ratified the unconstitutional enforcement of the 2019-2020 hair policy against M.T. and K.C.; and (3) chose not to similarly enforce Tatum ISD's grooming policy against white male students who were violation of the policy and identified by Plaintiffs. (DKT 56, ¶ 110). What is troubling about the Board's involuntary removal of Plaintiff's M.T. and K.C. from TISD is that the grooming policy was not supposed to ever be applied to elementary school students[2] and has only been enforced on African American students in elementary school. (See Ex. C, TISD 30(b)(6) Depo., 38:5-12).

---

[2] At the deposition of TISD Assistant Superintendent Drennon Fite, finally admitted that the grooming policy was never to be applied to elementary students because "at that level you don't

After the Plaintiffs were withdrawn from the district, TISD Superintendent J.P. Richardson admitted that TISD's grooming policy was unlawful:

> I have been pretty adamant about not changing the dress code for next year. If you would have asked me 6 months ago, I would have said to keep it the same. However, in the midst of what our country is going through right now. I have begun to change my thought process. Transgender students can have long hair so why can't other students have long hair. You can legally get a tattoo at 18 in Texas. There is no age or sex requirement to get your ears pierced.
>
> […]
>
> I always want to stay on the forefront and try to head off any issues that I might see coming our way. I can see if we allow long hair and not earrings then we will be fighting earrings. The same can go for tattoos. You may remember the day when women were frowned upon for wearing pants. They were required to wear dresses. Times changed then. I know that in history the **slave owners did not always allow the slaves to have long hair**. Would we now be possibly classified as slave owners? Could others challenge different aspects of the current dress code and put TISD in a negative manner once again? Will school dress codes be challenged for racial inequality in the near future? Today's Supreme Court ruling also scares me if a school district is ever challenged.

(See Ex. B, TISD 1188-1189). These statements coupled with the fact that only African American elementary students have ever been disciplined pursuant to this policy demonstrates disparate treatment that warrants a trial on the merits.

Furthermore, on May 27, 2023, Governor Greg Abbott signed into law the CROWN Act (House Bill No. 567), making Texas the twenty-first state to ban racial discrimination based on hair texture or hairstyle in schools, employment, and housing. The ("CROWN") Act, stands for Creating a Respectful and Open World for Natural Hair amends the definition of race in state antidiscrimination statutes to include traits historically associated with race, including hair, texture and protective hairstyles, including but not limited to "braids, locs, and twists." The

---

want to hold those kids accountable because at their age you want —that's not really their responsibility."  (See Ex. A, 58:7 - 59:1-7).

purpose of the act is to combat race-based discrimination and bias based on hair texture and hairstyle.

Prior to the signing of the Crown Act, African American male students in Tatum ISD have been disproportionately targeted (including high school and middle school) and penalized for violating grooming policies that have been designed to, and have the effect of, profiling, singling out, and burdening African American male children for wearing their hair in its natural state. The length of students' hair or their hairstyle have no bearing on students' capacity to learn, yet these wholly arbitrary grooming policies limit the mobility of African American male children in public and private spaces, deny them equal educational opportunities, and strike at the freedom and dignity of African American people.

TISD confusingly argues that Plaintiffs cannot prevail on their equal protection claim under disparate treatment unless they establish deliberate indifference on the part of TISD. Again "to state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Id. Nothing further is required.  Defendant has not met its burden to demonstrate that Plaintiff cannot establish any of these facts as a matter of law.  Defendant's arguments regarding the Board's knowledge or history of discriminating against minorities via TISD's grooming policy while relevant to a trier of fact are not grounds to dismiss Plaintiffs' Equal Protection claims based on race as a matter of law on Summary Judgment.

2.  Title VI

Here, as this Court previously ruled, the parties primarily rely on the same facts and arguments set forth for the discriminatory purpose or intent element of Plaintiffs' Equal Protection race discrimination claim. Accordingly, Defendants' motion for summary judgment

on Plaintiffs' Title VI race discrimination claims, must be DENIED for the same reasons stated above.

### C. TISD Did Not Meet Its Burden Of Proving There Is No Genuine Issue of Material Fact On Plaintiffs' Sex Discrimination Claims

#### 1. Equal Protection

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 n. 3 (5th Cir. 1999). To pursue a claim under section 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States, and; (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Sw. Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008); *see also West v. Atkins*, 487 U.S. 42 (1988). on a claim of gender discrimination under the Equal Protection Clause a plaintiff "must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001) ); *see also Hinojosa v. Martinez*, 53 F.3d 1281 (5th Cir. 1995). "Discriminatory intent" means " 'that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group.' " Id.

Because the laws are similar, courts use the jurisprudence developed under Title VI and Title VII to interpret Title IX. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994); *Bowers v. Bd. of Regents of the Univ. Sys. of Ga.*, 509 Fed.Appx. 906, 910 (11th Cir. 2013); *Richardson v.*

*Loyola Coll. of Md., Inc.*, 167 Fed.Appx. 223, 224 (D.C. Cir. 2005); *Middlebrooks v. Univ. of Md.*, 166 F.3d 1209 (4th Cir. 1999). Further, § 1983 actions challenging gender discrimination under the Equal Protection Clause are analyzed in the same manner as Title VII and Title IX cases. *See Giles v. Shaw Sch. Dist*, 655 Fed.Appx. 998, 1002 (5th Cir. 2016) (*citing Lee v. Conecuh County Bd. of Educ.,* 634 F.2d 959, 962 (5th Cir. 1981)).

A plaintiff bringing a claim under Title IX or § 1983 for a violation of the Equal Protection Clause, may use either direct or circumstantial evidence to prove that she was subjected to intentional discrimination. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994). " 'Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption.' " Id. at 328–29 (*quoting Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). "[D]irect evidence includes any statement or written document showing a discriminatory motive on its face." Id. at 329 (citations omitted). If a "plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the [defendant] to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.' " *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,* 778 F.3d 473, 475 (5th Cir. 2015) (*quoting Brown*, 989 F.2d at 861 ). When there is no direct evidence of intentional discrimination, a plaintiff must prove her case by inference using the *McDonnel Douglas* burden-shifting analysis. Id. at 475. First, the plaintiff must establish a *prima facie* case of discrimination, which creates a presumption that the defendant unlawfully discriminated against the plaintiff.

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail *v. Burdine*, 450 U.S. 248 (1981). If the plaintiff establishes a *prima facie* case of discrimination, the

burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. *Buisson v. Bd. of Supervisors of the La. Cmty. and Tech. Coll. Sys.*, 592 Fed.Appx. 237, 243 (5th Cir. 2014) (*citing McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) ). "If the [defendant] articulates a legitimate reason for the adverse ... action, 'the plaintiff then bears the ultimate burden of proving that the [defendant's] proffered reason is not true but instead is a pretext for the real discriminatory ... purpose.' " Id. (*quoting McCoy*, 492 F.3d at 556 ).

To establish a *prima facie* case under the *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973) burden shifting framework, when there is no direct evidence of discrimination a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he met the defendant's qualifications for participation in the activity; (3) he suffered an adverse action; and (4) that others not in his protected class received more favorable treatment under similar circumstances. *Buisson*, 592 Fed.Appx. at 243 (*citing McCoy*, 492 F.3d at 556 ).

Plaintiffs have presented direct evidence of gender discrimination. Namely, that female students are allowed to wear certain hairstyles while males are not. (See Ex. A., Fite Depo., 36:3-37:1)(See Ex. I, T. Fite Depo., 42:3-43:21). This direct evidence of gender discrimination would easily establish the prima facie elements of the *McDonnell Douglas* framework. Both of the Plaintiffs were disciplined for wearing their hairstyles in past their shoulders while female students were not. TISD did not address the prima facie elements for Plaintiffs' gender discrimination claims and therefore its motion most be denied.

TISD does argue that summary judgment should be granted because "[t[he District has already articulated several bases for its former dress and grooming code, including: (1) community expectations; (2) student success; and (3) career readiness. Exh. 1 at ¶¶ 6-10. This

statement was in response to the trial court's denial of Defendant's previous motion to dismiss wherein this Court stated in relevant part:

> Here, the challenged hair-length regulation only applies to male students. *See, e.g.,* Docket No. 1 at ¶ 1-1 at 2 (specifying that the listed hairstyles are not "allowed on male students" and limiting the hair-length regulation to "male hair"). Thus, intermediate scrutiny applies. To survive intermediate scrutiny, Tatum ISD must at least show that its gender-based hair and grooming policy serves important governmental objectives and that the discriminatory means employed are substantially related to achieving those objectives. *See Virginia*, 518 U.S. at 533. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 516 (citation omitted).
>
> Accordingly, the Court must first "hear and consider [Tatum ISD's] justifications before deciding, as a matter of law, whether the District's justifications survive the applicable level of scrutiny." *Sturgis v. Copiah Cnty. Sch. Dist.,* No. 3:10-CV-455-DPJ-FKB, 2011 WL 4351355, at *2 (S.D. Miss. Sept. 15, 2011) (denying defendants' motion to dismiss plaintiff's gender-based equal protection claim because "the decision should be made on a more complete record."); *see also Fenceroy v. Morehouse Par. Sch. Bd.,* No. CIV.A. 05-0480, 2005 WL 1968442, at *4 (W.D. La. Aug. 15, 2005) ("[T]he question is … whether there is an important and substantial reason girls are permitted to wear their hair in braids, but boys are not. Because review of a motion to dismiss is confined to the pleadings, the School Board has provided no reason for its dress code, and, even if it had, the Court could not inquire into the soundness of that reason.").

(DKT 28, 13-14).

Again, it is clear TISD's stated reasons for their policy is pretextual and invented post hoc in response to litigation. Initially, there are no contemporaneous documents that underscore any compelling governmental reasons behind such a policy. In fact when Assistant Superindent Fite was asked at deposition the reasons for the grooming policy he did not list (1) community expectations; (2) student success; and (3) career readiness as th reasons for the policy. (See Ex. A., Fite Depo., 37:3-3:4). In fact, Fite testified the reason for the policy was for extracurricular activities such as sports. Id. Furthermore,

TISD offers the declaration of J.P Richardson to validate the legitimacy of its grooming policy. Richardson is the same individual that said the policy needed to be changed and that he was concerned that TISD would be viewed as slaveowners if the policy was not changed. (See Ex. B, TISD 1188-1189). If TISD's rationale for the policy was truly genuine and not just an after-the-fact justification, one would expect Richardson to have penned an email in real-time, advocating for the policy in the name of community standards, student achievement, and future career preparedness—instead of revealing apprehensions about the district's image as slaveowners.

Secondly, it must be stressed again that at the deposition of TISD Assistant Superintendent Drennon Fite, admitted that the grooming policy was never to be applied to elementary students because "at that level you don't want to hold those kids accountable because at their age you want —that's not really their responsibility." (See Ex. A, Fite Depo., 58:7-59:1-7). Thirdly, TISD rescinded the policy after TISD Superintendent J.P. Richardson admitted that TISD's grooming policy was unlawful. (See Ex. B, TISD 1188-1189).

Finally, and most importantly a trier of fact could find that TISD enacted its grooming policy with the intent to discriminate based on gender—the polar opposite of a compelling state interest. TISD cites *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435–36 (9th Cir. 2008), out of circuit authority for the proposition that the District's stated reasons for the grooming policy: (1) community expectations; (2) student success; and (3) career readiness, mandates a judgment as a matter of law. However in *Jacobs*, the Ninth Circuit explained, "wearing clothing is not speech, and the mere act of wearing clothing does not express any message at all." *Jacobs v. Clark County School Dist.,* 526 F.3d 419, 438 (9th Cir.2008). This is in stark contrast to the Fifth Circuit's holding that "[f]or some, no doubt, the wearing of long hair is intended to convey a

15

discrete message to the world." *Karr v. Schmidt,* 460 F.2d 609 , 613 (5th Cir. 1972). Courts in the Fifth Circuit have recognized that "[v]isibly wearing one's hair in a particular manner is capable of communicating one's religion or heritage." *Gonzales v. Mathis Indep. Sch. Dist.,* No. 2:18-CV-43, 2018 WL 6804595, at *7 (S.D. Tex. Dec. 27, 2018*); see also Arnold v. Barbers Hill Indep. Sch. Dist.,* 479 F. Supp. 3d 511, 528 (S.D. Tex. 2020) (*citing A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 882 (S.D. Tex. 2009) ("[Plaintiff's] braids convey a particularized message of his Native American heritage and religion."), aff'd, 611 F.3d 248, 264 (5th Cir. 2010)). And in *Canady v. Bossier Parish Sch. Dist.*, 240 F.3d 437 (5th Cir. 2001), the Fifth Circuit rejected the assertion that "hair style never warrants First Amendment protection." 240 F.3d at 440 n.1. It also found that protected speech may include acts such as wearing "clothing [that] symbolize[s] ethnic heritage, religious beliefs, and political and social views." Id. at 441–42.

TISD next cites another out of circuit case *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005) for the proposition that TISD's stated reasons for the policy should be sufficient to mandate a judgment as a matter of law. *Blau* involved a parent's challenge to the dress code at his daughter's middle school. Here too, the facts of *Blau* are distinguishable and do not lend any support for Defendant's purported use of post hoc rationalizations for maintaining a grooming policy that discriminates based on gender.

    2. **Title IX**

Defendant's motion for summary judgment on Plaintiffs' Title IX sex discrimination claim, must be DENIED for the same reasons as stated for Plaintiffs' 1983 Equal Protection claims. Defendant does argue that as a matter of law, M.T. and K.C. cannot recover mental anguish damages under statutes that were enacted pursuant to the Spending Clause – such as

Title VI or Title IX. *See Cummings v. Premier Rehab Keller, PLLC*, 142 S.Ct. 1562, 1569-76 (2022)." Plaintiffs are still entitled to nominal damages and attorneys' fees and costs and the holding in *Cummings* is not a basis to dismiss Plaintiffs' claims.

TISD next argues that the United States Department of Education (the DOE) has already concluded Title IX does not apply to appearance codes. Again, this conveniently allows TISD to refuse to respond to this Court's directions that in order "to survive intermediate scrutiny, Tatum ISD must at least show that its gender-based hair and grooming policy serves important governmental objectives and that the discriminatory means employed are substantially related to achieving those objectives. *See Virginia*, 518 U.S. at 533. "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 516 (citation omitted). TISD's silence on this issue mandates a denial of their motion to dismiss on Plaintiff's claims.

TISD argues that over four decades ago, the DOE adopted a regulation that prohibited discrimination "in the application of codes of personal appearance." 39 Fed. Reg. 22,228-01, 22,228–29 (June 20, 1974). The DOE's regulations are no longer good law. This is because on May 27, 2023, Governor Greg Abbott signed into law the CROWN Act (House Bill No. 567), making Texas the twenty-first state to ban racial discrimination based on hair texture or hairstyle in schools, employment, and housing. The ("CROWN") Act, stands for Creating a Respectful and Open World for Natural Hair amends the definition of race in state antidiscrimination statutes to include traits historically associated with race, including hair, texture and protective hairstyles, including but not limited to "braids, locs, and twists." The purpose of the act is to combat race-based discrimination and bias based on hair texture and hairstyle.

Against as stated above, the signing of the Crown Act demonstrates that the length of students' hair or their hairstyle have no bearing on students' capacity to learn, and wholly arbitrary grooming policies limit the mobility of African American male children in public and private spaces, denying them equal educational opportunities, and strike at the freedom and dignity of African American people.

### D. TISD Did Not Meet Its Burden Of Proving There Is No Genuine Issue of Material Fact On Plaintiffs' First Amendment Claims

Plaintiffs assert that they let their hair grow long to express their religious beliefs. (See Ex. D., Woodley Depo., 60:4-62:23)(See Ex. E., Cox Depo., 90:20-1:5)(See Ex. G., M.T. Depo. 23:11-24:24)(See Ex. H., K.C. Depo., 18:15-20, 19:19-20:24). TISD questions the sincerity of these beliefs, which again mandates a trial on the merits. Furthermore, as this Court previously ruled on Defendant's Motion to Dismiss Plaintiffs' claims for First Amendment violations, TISD must address an "important or substantial governmental interest for promulgating its hair and grooming policy." As stated above TISD has failed to do so. As stated above Fifth Circuit has held that "[f]or some, no doubt, the wearing of long hair is intended to convey a discrete message to the world." *Karr v. Schmidt,* 460 F.2d 609 , 613 (5th Cir. 1972). Courts in the Fifth Circuit have recognized that "[v]isibly wearing one's hair in a particular manner is capable of communicating one's religion or heritage." *Gonzales v. Mathis Indep. Sch. Dist.,* No. 2:18-CV-43, 2018 WL 6804595, at \*7 (S.D. Tex. Dec. 27, 2018*); see also Arnold v. Barbers Hill Indep. Sch. Dist.,* 479 F. Supp. 3d 511, 528 (S.D. Tex. 2020) (*citing A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 882 (S.D. Tex. 2009) ("[Plaintiff's] braids convey a particularized message of his Native American heritage and religion."), aff'd, 611 F.3d 248, 264 (5th Cir. 2010)). And in *Canady v. Bossier Parish Sch. Dist.*, 240 F.3d 437 (5th Cir. 2001), the Fifth Circuit rejected the assertion that "hair style never warrants First Amendment

protection." 240 F.3d at 440 n.1. It also found that protected speech may include acts such as wearing "clothing [that] symbolize[s] ethnic heritage, religious beliefs, and political and social views." Id. at 441–42.

## IV.   CONCLUSION

Based on the foregoing, Defendant's Motion must be DENIED in its entirety.


BRAD STEELE
LAW OFFICE OF BRADLEY STEELE
Texas Bar No. 19099350
1101 Judson Road
Longview, Texas 7560 I
Telephone: 903/234-8844
Facsimile: 903/234-8848
Email: brad@bradsteelelaw.com

McCOY LAW FIRM

*Waukeen McCoy*
WAUKEEN McCOY
California Bar No. 168228
111 Maiden Lane. 6th Floor
San Francisco, CA 94108
Telephone: 415/675-7705
Facsimile: 415/67 5-2530
Email: mail@mccoyslaw.com
*Admitted Pro hac Vice
ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2023, a true and correct copy of the foregoing document was served on counsel of record via E-mail. as follows:

Amy Demmler
adcmmlcrm nngllp.com